UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Moenay Womack, individually and as Guardian ad Litem of M.J., T.J., and J.J., minors,<br><br>Plaintiffs,<br><br>vs.<br><br>Progressive Northern Insurance Company,<br><br>Defendant/Third-Party Plaintiff,<br><br>vs.<br>Jamaris Jordan,<br><br>Third-Party Defendant. | Civil Action No. 4:25-cv-02749-JD<br><br>**MEMORANDUM ORDER AND OPINION** |

This insurance-coverage action is before the Court on Defendant/Third-Party Plaintiff Progressive Northern Insurance Company's ("Progressive") Motion for Summary Judgment (DE 19) and Motion for Default Judgment against Third-Party Defendant Jamaris Jordan (DE 20). Plaintiffs filed a Response in Opposition to the summary-judgment motion (DE 23) and opposed entry of final default judgment (DE 22). Progressive filed replies. (DE 25; DE 26.)

After reviewing the initial summary-judgment record, the Court directed limited supplementation. (DE 28.) As the Court observed, the complete insurance policy was not then part of the Rule 56 record and that Amy Jordan's deposition testimony reflected occasional operation of the subject Kia notwithstanding

Progressive's initial characterization of the record as establishing non-use. The Court therefore directed the parties to address (1) whether, assuming Amy occasionally operated the Kia, she nevertheless lacked an insurable interest under South Carolina law; and (2) the policy-specific consequences of that determination, including insured status, liability and UIM coverage, and Progressive's asserted duties to defend and indemnify. Progressive filed a supplemental memorandum and certified copy of Policy No. 963870121 (DE 29), and Plaintiffs filed a supplemental response (DE 30).

For the reasons below, Progressive's Motion for Summary Judgment is granted in part, and its Motion for Default Judgment is granted in part.

## I. BACKGROUND

### A. The Policy and the 2013 Kia

The following facts are viewed in the light most favorable to Plaintiffs as the nonmoving parties.

Progressive issued Policy No. 963870121 (the "Policy") to Amy Jordan ("Amy"). (DE 29-1.) The declarations page identifies Amy as the named insured and lists her husband, Bobby Jordan ("Bobby"), as a driver and household resident. (*Id.* at 1.) The declarations page in effect on September 14, 2024, also listed a 2013 Kia Optima owned by Plaintiff Moenay Womack ("Womack"). (Amy Jordan Dep. 15:23–16:15, DE 29-2 at 11–12; DE 29-1 at 1–3.) The change adding the Kia was effective August 26, 2024. (DE 29-1 at 1.) Womack is involved in a long-term relationship with Amy and Bobby Jordan's son, Jamaris Jordan. (DE 1-1.)

Womack purchased the Kia and remained its sole titled owner. Amy never held title to the Kia, made payments on it, or acquired an ownership interest in it. Womack paid approximately $97 per month for the Kia to be insured under Amy's Policy. Amy testified that the Kia belonged to Womack, that she did not rely on it for transportation, and that she would not have lost money if it had been totaled. Amy also testified that she may have driven the Kia at times, such as to the store. (Amy Jordan Dep. 19:10–20:9, 26:7–13, 27:21–28:3, DE 29-2; *see also* DE 29 at 3–4.)

The evidence concerning Bobby's use is more substantial. Viewing the evidence in Plaintiffs' favor, the Kia spent considerable time at the Jordan residence; Bobby drove it regularly and sometimes used it without first asking Womack. During 2024, Womack maintained a residence in Dillon but testified that she did not "technically live" with Amy and was nevertheless at Amy's house "as much as" she was at her own. She later explained that, when the Kia was operable, it was "just as much at [Jamaris's] mother's house as it was at [her] house," with Womack spending about a week in Green Sea and the next in Dillon. When Womack was at the Jordan residence, she testified that either Bobby or Jamaris drove the Kia. (Womack Dep. 19:17–19, 31:14–19, 32:12–25, DE 23-1; *see also* DE 23 at 2–3; DE 30 at 1–2.)

**B. The Accident and the Parties' Coverage Positions**

On September 14, 2024, Jamaris was driving the Kia in a single-vehicle accident while Womack and her children were passengers. Womack testified that her address at the time was 705 East Dargan Street in Dillon and that Jamaris lived there with her. (Womack Dep. 19:20–25, DE 23-1; *see also id.* at 5:15–6:4.) She also

testified that she and Jamaris had been at his mother's residence before leaving on the day of the accident. (*Id.* at 31:1–6.)

The date-specific testimony concerning Jamaris's residence is consistent: both Womack and Amy testified that Jamaris lived with Womack in Dillon in September 2024. (Womack Dep. 19:20–25, DE 23-1; Amy Jordan Dep. 25:15–19, 27:18–20, DE 29-2.) The record also reflects that Jamaris maintained continuing contact with his parents' household and spent time there. Amy had described his living arrangement in early 2023 as "on and off," although she later testified that by February 24, 2023, he was grown and out of the house. (Amy Jordan Dep. 12:10–18, 13:14–16, DE 29-2.) Neither Womack nor Jamaris was listed on the Policy's declarations page as a driver or household resident. (DE 29-1 at 1–3.)

Neither Womack nor Jamaris was listed on the Policy's declarations page as a driver or household resident. (DE 29-1 at 1–3.)

Plaintiffs seek declaratory relief concerning coverage for the accident. They contend that Amy possessed an insurable interest because she occasionally used the Kia, because Bobby exercised substantial practical control over it, and because the vehicle provided transportation benefits to members of Amy's household. (DE 23 at 2–6; DE 30 at 1–3.) Progressive contends that Amy, as the sole named insured, lacked the ownership, control, responsibility, and direct economic stake necessary to support coverage. Progressive argues that the Kia-specific coverage was therefore void from inception; and that no liability or UIM coverage applies to the accident. (DE 19-1 at

5–12; DE 25 at 1–5; DE 29 at 2–8.) Progressive also seeks a declaration that it has no duty to defend or indemnify Jamaris. (DE 4; DE 19.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of identifying the basis for the motion and the portions of the record demonstrating the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party will bear the burden of proof at trial, the movant may satisfy that responsibility by pointing to an absence of evidence supporting an essential element of the nonmovant's case. *Id.* at 324–25.

Once the movant makes that showing, the nonmoving party must identify specific record evidence from which a reasonable factfinder could find in its favor. *See* Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986). A fact is material if it could affect the outcome under governing law, and a dispute is genuine if the evidence would permit a reasonable factfinder to return a verdict for the nonmoving party. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

Summary judgment may not be granted merely because the Court believes the movant ultimately is more likely to prevail at trial. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). Rather, "[t]he court may grant summary judgment only if it concludes that the evidence could not permit a

reasonable jury to return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). The Court, therefore, views the evidence in the light most favorable to the nonmoving party and does not weigh competing evidence or make credibility determinations. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018).

Rule 56 permits summary judgment on an entire claim or defense or on only part of a claim or defense. Fed. R. Civ. P. 56(a). Accordingly, failure to establish entitlement to all relief requested does not prevent the Court from resolving those portions of the coverage dispute that present no genuine issue for trial.

## III. DISCUSSION

### A. Progressive's Motion for Summary Judgment

#### 1. South Carolina Insurable-Interest Law

South Carolina requires automobile liability insurance to be supported by an insurable interest in the named insured. *Am. Mut. Fire Ins. Co. v. Passmore*, 274 S.E.2d 416, 417 (S.C. 1981); *see also Nationwide Mut. Ins. Co. v. Smith*, 654 S.E.2d 837, 840–41 (S.C. Ct. App. 2007). The required interest "does not depend upon the named insured having either a legal or equitable interest in the property," and it is sufficient if "the insured may be held liable for damages to its operation and use." *Passmore*, 275 S.C. at 620–21, 274 S.E.2d at 417–18 (quotation omitted).

South Carolina's broader property-insurance cases similarly explain that "any one has an insurable interest in property who derives a benefit from its existence or would suffer loss from its destruction." *Benton & Rhodes, Inc. v. Boden*, 426 S.E.2d

823, 825 (S.C. Ct. App. 1993) (quoting *Crook v. Hartford Fire Ins. Co.*, 178 S.E. 254, 257 (S.C. 1935)). The relationship to the property may consist of "any right, benefit or advantage," "any liability in respect thereof," or another relation of such a nature that the contemplated peril might "directly damnify the insured." *Id.* at 825–26. And "the insured must prove an insurable interest in the property both at the time the policy is issued and becomes effective and at the time of the loss." *Powell v. Ins. Co. of N. Am.*, 330 S.E.2d 550, 552 (S.C. Ct. App. 1985).

The automobile cases focus particularly on ownership, control, responsibility for use, and potential liability. In *Passmore*, the South Carolina Supreme Court rejected an asserted negligent-entrustment interest because the "essential elements" were absent: the named insured "did not own the car," "did not have control over the car," and "was not responsible for its use." 274 S.E.2d at 418. Similarly, *USAA General Indemnity Co. v. McCullough* held that a named insured lacked an insurable interest in his adult son's vehicle because he "lacked the necessary ownership or control over the vehicle to create an insurable interest." No. 5:16-cv-03110-JMC, 2018 WL 1036211, at *3 (D.S.C. Feb. 23, 2018).

*USAA General Indemnity Co. v. Pelichet* is particularly instructive concerning occasional operation. There, the named insured's adult son owned the automobile and permitted the named insured to use it as needed. The court expressly acknowledged that "Young occasionally used the Chrysler," but found no insurable interest because he considered it his son's car and there was "no evidence that Young was responsible for its use or for maintaining the car in working order." No. 8:19-cv-1610-TMC, 2021

WL 9100390, at *4 (D.S.C. Dec. 9, 2021). The court therefore rejected the asserted insurable interest notwithstanding the named insured's occasional use. *Id.*

*Smith* does not establish that family transportation or occasional use necessarily creates an insurable interest. There, the South Carolina Court of Appeals held that insurable interest was "pivotal" and remanded because the trial court had treated the issue as irrelevant rather than deciding whether the named insured actually possessed the required interest. 654 S.E.2d at 843. The majority therefore left that fact-specific determination unresolved. *Id.*

**2. Amy Jordan Lacked an Insurable Interest in the Kia**

Plaintiffs principally advance two theories. First, they distinguish *Pelichet* factually, emphasizing that the Kia spent substantial time at the Jordan residence, that Bobby regularly operated it and sometimes did so without first asking Womack, that Amy occasionally operated it, and that Jamaris also used it. (DE 23 at 2–6; DE 30 at 1–2.) Second, Plaintiffs argue that Bobby's practical control may be attributed to Amy and that Amy derived a legally cognizable benefit because the Kia was available to her and provided transportation to members of her family. (DE 30 at 2–3.)

The Court accepts the underlying evidence for purposes of Rule 56 but not the legal inferences Plaintiffs draw from it. Amy did not own the Kia, hold title to it, or finance it, and the record contains no evidence that she was responsible for maintaining it. She regarded the Kia as Womack's vehicle, testified that she did not rely on it for transportation, and testified that she would not have lost money if it had

been totaled. (Amy Jordan Dep. 16:14–16, 27:21–28:3, DE 29-2; DE 29 at 3.) The record likewise does not show that Amy herself possessed authority to determine who could operate the Kia, undertook responsibility for maintaining it, or otherwise assumed responsibility for its use. *Cf. Passmore*, 275 S.C. at 418 (finding no potential liability where the named insured did not own or control the car and was not responsible for its use).

Amy's occasional operation does not materially alter that conclusion. The Court assumes, as its supplemental order directed, that Amy occasionally drove the Kia. (DE 28; Amy Jordan Dep. 26:7–13, DE 29-2.) But *Pelichet* involved a named insured who likewise occasionally operated another person's vehicle and nevertheless lacked an insurable interest because he did not own or control the vehicle and was not responsible for its use or maintenance. 2021 WL 9100390, at *4. Occasional permissive operation, without more, therefore does not supply the ownership, control, responsibility, or comparable direct economic relation that the cited authorities require.

Plaintiffs' reliance on Bobby's use and control does not fill that gap as to Amy. Womack testified that Bobby drove the Kia frequently when it was at the Jordan residence and sometimes took it without first asking. (Womack Dep. 31:7–33:10, DE 23-1; DE 23 at 2–3.) But Plaintiffs identify no South Carolina authority imputing a spouse's practical control of another person's automobile, or the spouse's potential personal tort liability, to the named insured merely by virtue of marriage. The negligent-entrustment cases instead ask whether the person whose liability is

asserted is "the owner or one in control of the vehicle and responsible for its use." *Passmore*, 274 S.E.2d at 418 (quotation omitted). And the family-purpose doctrine requires that the person sought to be charged be the head of the family and own, maintain, or furnish the automobile. *Gause v. Smithers*, 742 S.E.2d 644, 648 (S.C. 2013). The record does not permit a reasonable finding that Amy occupied either position with respect to Womack's Kia.

Nor does the Court hold that every non-ownership interest must involve potential tort liability. *Benton & Rhodes* recognizes a broader class of direct economic relations capable of supporting insurance. But the benefits identified here, the availability of another person's automobile for occasional use and the convenience the vehicle provided to family members, do not supply evidence that Amy herself stood to suffer the direct pecuniary injury, legal responsibility, or loss contemplated by those authorities. *See Benton & Rhodes*, 426 S.E.2d at 825–26. Amy's own testimony that she did not rely on the Kia and would suffer no monetary loss if it were destroyed is consistent with that conclusion. (Amy Jordan Dep. 27:21–28:3, DE 29-2.)

The evidence concerning Bobby is different. Plaintiffs have identified evidence from which a factfinder could conclude that Bobby exercised considerably greater practical control and use of the Kia. (DE 23 at 2–6; DE 30 at 1–2.) But the declarations page identifies Amy alone as the named insured. Although the Policy-defined term "you" includes the named insured's resident spouse (DE 29-1 at 14), that contractual definition does not make Bobby a named insured for purposes of South Carolina's insurable-interest rule. *Passmore* states the requirement in terms of "the named

insured." 274 S.E.2d at 417. The Court therefore need not decide whether Bobby independently possessed an insurable interest.

Accordingly, even viewing the record in Plaintiffs' favor, no reasonable factfinder could conclude that Amy possessed an insurable interest in the Kia when the Kia-specific coverage became effective on August 26, 2024, or at the time of the September 14, 2024, loss. Progressive is entitled to summary judgment on that issue.

**3. Effect of Amy's Lack of an Insurable Interest**

South Carolina law supplies the consequence of that determination. "Where an insurable interest does not exist at the time the contract for insurance was made, the insurance policy is void from its inception." *Smith*, 654 S.E.2d at 842 (citing *Abraham v. New York Underwriters Ins. Co.*, 196 S.E. 531, 534 (S.C. 1938)). *McCullough* applied that rule by declaring the policy void as to the particular vehicle for which the named insured lacked an insurable interest. 2018 WL 1036211, at *6.

That conclusion must be stated with precision in this multi-vehicle Policy. The Kia-specific coverage became effective August 26, 2024. (DE 29-1 at 1.) Amy's lack of an insurable interest therefore rendered the attempted coverage for the Kia void from its inception on that date. It does not invalidate Policy No. 963870121 in its entirety or disturb coverage relating to other vehicles and interests not challenged here.

Progressive characterizes its post-loss action as rescission of coverage for the Kia. (DE 4 ¶¶ 15–16; DE 19-1 at 1–2; DE 25 at 1–4.) The Court need not determine whether that action independently satisfied requirements applicable to contractual or statutory rescission. The consequence material to DE 19 follows from the

insurable-interest rule itself: the coverage purportedly added for the Kia was void from its inception. The Court therefore does not adjudicate any separate ground for rescission.

#### 4. Liability Coverage

The conclusion that the Kia was not validly added as a covered auto does not, standing alone, answer every possible avenue of liability coverage under the Policy. Part I provides that Progressive will pay damages for which an "insured person" becomes legally responsible because of an accident and will settle or defend claims for damages covered by Part I. (DE 29-1 at 14.) As relevant here, an "insured person" includes "you, a relative, or a rated resident with respect to an accident arising out of the ownership, maintenance or use of an auto or a trailer" and "any person with respect to an accident arising out of that person's use of a covered auto with the permission of you, a relative, or a rated resident." (*Id*. (emphasis omitted).)

The second category does not provide Jamaris coverage. Progressive argues that because the Kia-specific coverage was void, the Kia cannot qualify as a "covered auto" and Jamaris therefore cannot obtain coverage as a permissive user of a covered auto. (DE 29 at 5–7.) The Court agrees with that limited proposition. The Kia's physical appearance on the declarations page cannot, by itself, create valid "covered auto" status when the coverage purportedly attaching to that listing was void from its inception. *See Smith*, 654 S.E.2d at 841–42; *McCullough*, 2018 WL 1036211, at *6.

The first category is different. It applies to "you, a relative, or a rated resident" with respect to the use of "an auto," rather than only a covered auto. (DE 29-1 at 14)

(emphasis omitted.) Thus, if Jamaris qualified as Amy's resident "relative," the initial coverage grant does not, on its face, depend on the Kia's status as a covered auto. Progressive nevertheless argues that Jamaris was not a relative because he had been living with Womack away from his parents' household for several years and was not listed as a household resident. (DE 29 at 5–6.)

The Policy defines a "relative" as a person residing in the same household as the named insured and related to the named insured or her spouse by blood, marriage, or adoption. (DE 29-1 at 13.) Jamaris is Amy's adult son. The pertinent question is therefore residency.

South Carolina does not treat maintenance of a separate address as categorically defeating household residency. In *Buddin v. Nationwide Mutual Insurance Co.*, the Supreme Court explained that "a resident of the same household is one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently." 157 S.E.2d 633, 636 (S.C. 1967) (quotation omitted). Relatedly, South Carolina recognizes that "[a] person may have only one domicile but may have several residences." *Cook v. Federal Insurance Co.*, 211 S.E.2d 881, 884 (S.C. 1975). *Auto-Owners Insurance Co. v. Horne* applies those principles in the insurance context and treats household residency as a fact-specific inquiry rather than a function of a single formal address. 586 S.E.2d 865, 869–75 & n.8 (S.C. Ct. App. 2003).

The evidence must nevertheless permit a reasonable inference that Jamaris actually resided in Amy's household at the relevant time. A person may maintain

more than one residence, but that alone does not establish a second residence. Under *Buddin*, the question is whether the person, rather than being a temporary or transient visitor, "lives together with others in the same house for a period of some duration[.]"157 S.E.2d at 636.

The date-specific testimony points in one direction. Womack testified that she and Jamaris lived at 705 East Dargan Street in Dillon from May 2023 through February 2025 and that Jamaris lived there with her on September 14, 2024. (Womack Dep. 5:15–6:4, 19:20–25, DE 23-1.) Amy likewise testified that, in September 2024, Womack and Jamaris lived in Dillon and did not live with Amy and Bobby. (Amy Jordan Dep. 25:15–19, 27:18–20, DE 29-2.)

Plaintiffs point to other evidence showing that Womack spent substantial time at the Jordan residence and that Jamaris was present there on recurring occasions. Womack testified that she was at Amy's house as much as at her own during portions of 2024, that the Kia alternated between Green Sea and Dillon, and that either Bobby or Jamaris drove it when they were at the Jordan residence. (Womack Dep. 19:17–19, 31:14–32:25, DE 23-1.) She also testified that she and Jamaris were at his mother's house before leaving on the day of the accident. (*Id.* at 31:1–6.) That evidence supports an inference that Jamaris visited or spent time at his parents' home. Without more, however, it does not establish that he lived there for any meaningful period.

Amy's testimony that Jamaris's arrangement was "on and off" does not supply the missing temporal connection. That testimony arose while Amy was discussing a

February 2023 policy declaration, more than a year and a half before the accident. (Amy Jordan Dep. 12:6–18, DE 29-2.) While discussing a policy change later that same month, Amy agreed that Jamaris was then "grown and out of the house." (*Id.* at 13:14–16.) Nothing in that testimony establishes that an intermittent living arrangement continued through September 2024.

*Cook* recognizes that a person may have several residences, 211 S.E.2d at 884, but that principle does not convert recurring family visits into household residence. And *Horne* confirms that even meaningful and repeated connections to a parent's household do not necessarily establish resident-relative status where the evidence does not show that the person actually resided there. 586 S.E.2d at 869–75.

Viewing the evidence and reasonable inferences in Plaintiffs' favor, the record would permit a factfinder to conclude that Jamaris visited and spent time at his parents' residence. It would not permit a non-speculative finding that, on September 14, 2024, he also "live[d] together" with Amy and Bobby there "for a period of some duration." *Buddin*, 157 S.E.2d at 636. Progressive has therefore established that Jamaris did not qualify as a resident "relative" under Part I at the time of the accident.

Jamaris therefore does not qualify as an "insured person" under the first relevant category of Part I. He is not "you," he was not a resident "relative" of Amy's household at the time of the accident, and he was not a rated resident listed on the declarations page. Nor can he obtain insured-person status through the second category because, as explained above, the Kia did not constitute a valid "covered

auto." Accordingly, the Policy affords no Part I liability coverage for Jamaris's operation of the Kia in the September 14, 2024, accident, and Progressive has no duty under Part I to defend or indemnify him in connection with that accident.

**5. UIM Coverage**

Progressive also seeks summary judgment on Plaintiffs' claim for UIM coverage. Part III provides that, "[i]f you pay the premium for this coverage," Progressive will pay covered damages that an "insured person" is legally entitled to recover from the owner or operator of an underinsured motor vehicle. (DE 29-1 at 21) (emphasis omitted.) An "insured person" includes, among others, "you, a relative, or a rated resident," as well as specified users and occupants of a covered auto. (*Id*. at 21–22) (emphasis omitted.) The Policy defines an "underinsured motor vehicle" as a vehicle to which qualifying liability insurance or a bond applies at the time of the accident but whose limits are less than the damages sustained. (*Id*. at 22.)

Progressive argues that once the Kia-specific coverage is disregarded, no liability insurance applied to the Kia and the Kia therefore cannot qualify as an "underinsured motor vehicle." (DE 29 at 8.) Womack testified that the Kia was not insured under another automobile liability policy at the time of the accident. (Womack Dep. 33:1–10, DE 23-1.) And, for the reasons explained above, Part I does not afford liability coverage for Jamaris's operation of the Kia. Thus, no qualifying liability insurance applied to the Kia at the time of the accident.

Under Part III's definition, therefore, the Kia does not qualify as an "underinsured motor vehicle" for purposes of Plaintiffs' UIM claim. Progressive is entitled to summary judgment on that claim.

**B. Progressive's Motion for Default Judgment Against Jamaris Jordan**

The Clerk entered default against Jamaris on May 1, 2025. (DE 11.) Jamaris has not appeared. Plaintiffs do not dispute that he was properly served or that he failed to answer or otherwise defend. (DE 22 at 1.) They oppose final default judgment, however, arguing principally that Progressive should not be permitted to use Jamaris's default to avoid an adjudication of the coverage dispute on the merits. (*Id.* at 1–2.) Progressive responds that the default establishes the well-pleaded factual allegations of the Third-Party Complaint and that those allegations support declaratory relief. (DE 20 at 4–6; DE 26 at 2–3.)

A defaulting defendant admits the plaintiff's well-pleaded factual allegations, but not conclusions of law, and the Court must still determine whether the admitted facts provide a sufficient legal basis for the relief requested. *Ryan v. Homecomings Financial Network*, 253 F.3d 778, 780 (4th Cir. 2001). Thus, Jamaris's default does not itself establish the legal conclusions that Amy lacked an insurable interest, that coverage was void, or that no liability or UIM coverage exists.

Those legal questions, however, have now been independently resolved on the merits. As explained above, the Court concludes that Amy lacked an insurable interest in the Kia; that the attempted Kia-specific coverage was void from inception; that Jamaris did not qualify as a resident "relative" or otherwise as an insured person

under Part I for his operation of the Kia; that Part I affords no liability coverage and imposes no duty to defend or indemnify Jamaris; and that the Kia does not qualify as an "underinsured motor vehicle" under Part III. The legal basis for the declaratory relief sought against Jamaris therefore rests on the Court's merits determination, not merely on his failure to appear.

Plaintiffs' principal objection to final default judgment accordingly no longer presents the concern it did before disposition of the summary-judgment motion. As Plaintiffs argued, entering judgment against Jamaris would permit Progressive to obtain through default a coverage determination that Plaintiffs were entitled to litigate on the merits. (DE 22 at 1–2.) The Court has now adjudicated those common coverage questions on the merits after considering Plaintiffs' evidence and arguments. Plaintiffs therefore are not being bound by Jamaris's default. Rather, the proposed default judgment against Jamaris follows the same coverage determinations independently reached as to the litigating parties. Plaintiffs' opposition was expressly premised on avoiding an end-run around merits adjudication.

For the same reason, the inconsistency concerns addressed in *Frow v. De La Vega*, 82 U.S. 552 (1872), and *United States ex rel. Hudson v. Peerless Insurance Co.*, 374 F.2d 942 (4th Cir. 1967), no longer warrant withholding final judgment. Those authorities counsel against entering a final default judgment while closely related merits issues remain unresolved because doing so could produce inconsistent judgments. Indeed, *Frow* contemplated that, once the common merits were resolved

in the plaintiff's favor, the plaintiff would then be entitled to final relief against the defaulting defendant. 82 U.S. at 554. Here, the common coverage questions have now been resolved in Progressive's favor, and a default judgment tracking those rulings creates no risk of an inconsistent adjudication. The rationale for withholding final default relief therefore no longer applies. The underlying *Frow/Hudson* principle is that judgment against the defaulting party should await resolution of the common merits; once those merits are resolved consistently with the requested relief, final judgment may follow.

The scope of that relief should nevertheless correspond to the issues the Court has actually decided. Progressive's default-judgment motion requests declarations that Amy and Bobby lacked an insurable interest, that the Policy was properly rescinded as to the Kia, and that no liability or UIM coverage exists. (DE 20 at 6.) The Court has not separately determined whether Bobby independently possessed an insurable interest or whether Progressive's post-loss action independently satisfied requirements applicable to rescission. Jamaris's default does not require the Court to decide those unnecessary legal questions. Progressive's request for final default relief is therefore granted only to the extent consistent with the merits rulings above.

Accordingly, Progressive's Motion for Default Judgment against Jamaris Jordan (DE 20) is **GRANTED IN PART**. The Court declares that Policy No. 963870121 affords Jamaris no liability or UIM coverage for the September 14, 2024, accident and that Progressive owes no duty under the Policy to defend or indemnify him in connection with that accident. To the extent DE 20 seeks separate declarations

concerning Bobby Jordan's independent insurable interest or the legal sufficiency of Progressive's post-loss rescission, the motion is denied as unnecessary. Because Progressive seeks declaratory relief rather than damages and the record provides a sufficient basis for that relief, no evidentiary hearing is required.

## IV. CONCLUSION

For the foregoing reasons, Progressive Northern Insurance Company's Motion for Summary Judgment (DE 19) is **GRANTED IN PART** and otherwise **DENIED AS UNNECESSARY** to the extent it seeks separate adjudication of Bobby Jordan's independent insurable interest or the legal sufficiency of Progressive's post-loss rescission. The Court DECLARES that Amy Jordan, the named insured under Policy No. 963870121, lacked an insurable interest in the 2013 Kia Optima when the Kia-specific coverage became effective on August 26, 2024, and at the time of the September 14, 2024, loss. The attempted addition of the Kia as a covered automobile was therefore void from inception as to that vehicle, and the Kia's listing on the declarations page does not create valid "covered auto" status for the accident.

The Court further DECLARES that Jamaris Jordan did not qualify as a resident "relative" or otherwise as an insured person under the applicable provisions of Part I for his operation of the Kia; that the Policy affords no liability coverage for the September 14, 2024, accident; and that Progressive owes no duty under Part I to defend or indemnify Jamaris in connection with that accident.

The Court further DECLARES that the Kia does not qualify as an "underinsured motor vehicle" under Part III because no qualifying liability insurance

applied to it at the time of the accident. Progressive is therefore entitled to summary judgment on Plaintiffs' claim for UIM coverage. The Court does not reach the separate effect of the declarations-page notation that Underinsured Motorist Bodily Injury coverage was rejected.

The Court does not separately determine whether Bobby Jordan independently possessed an insurable interest or whether Progressive's post-loss action independently satisfied requirements applicable to rescission because those determinations are unnecessary to the foregoing coverage rulings.

Progressive's Motion for Default Judgment against Jamaris Jordan (DE 20) is **GRANTED IN PART** and otherwise **DENIED AS UNNECESSARY.** The Court DECLARES that Policy No. 963870121 affords Jamaris no liability or UIM coverage for the September 14, 2024, accident and that Progressive owes no duty under the Policy to defend or indemnify him in connection with that accident.

These rulings resolve the parties' declaratory coverage claims. The Clerk is directed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Florence, South Carolina
September 18, 2026